# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2252
No. 06-2365

_____

| | | |
|---|---|---|
| Trinity Products, Inc., | * | |
| | * | |
| Plaintiff - Appellee/ | * | |
| Cross Appellant, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Burgess Steel, L.L.C., | * | |
| | * | |
| Defendant - Appellant/ | * | |
| Cross Appellee. | * | |

_____

Submitted: December 11, 2006
Filed: May 7, 2007

_____

Before LOKEN, Chief Judge, MURPHY and SHEPHERD, Circuit Judges.

_____

LOKEN, Chief Judge.

Burgess Steel, L.L.C. (Burgess), hired Trinity Products, Inc. (Trinity), to fabricate two steel towers. After the first tower was erected, the owner rejected it because the base plate was warped. Burgess directed Trinity to fabricate and deliver a replacement. At the end of the project, Trinity sued for the balance of the contract price and for extra work not covered by the contract, primarily the value of the replacement tower. Burgess counterclaimed for breach of contract. The dispute is governed by the Missouri Uniform Commercial Code. The district court granted

Trinity summary judgment of $102,958 on its contract claim and dismissed Burgess's counterclaims. After trial, the jury awarded Trinity $60,660 for extra work. The court awarded Trinity $114,649.73 in attorneys' fees but denied prejudgment interest and an additur. Burgess appeals the adverse judgment, and Trinity cross appeals the denial of an additur and prejudgment interest. We reverse the grant of summary judgment, vacate the award of attorneys' fees, affirm the jury verdict, and remand.

## I. Background

The general contractor hired Burgess to erect two 75-foot, 125-ton steel towers on top of a two-story building in midtown Manhattan. Burgess hired Trinity to fabricate the towers in St. Louis and deliver them to the New York City job site. The contract price as amended by three change orders was $601,896. Trinity's two-page sale agreement was accepted by Burgess, with significant hand-written modifications, on March 5, 2003.

To fabricate each tower, Trinity welded a seven-foot square base plate, two inches thick, to the foot of the tower column. The towers when erected would be bolted to the building's girder connections through holes in the steel base plates. While welding the base plate to the first tower (referred to by the parties as the north tower), Trinity's welders and welding inspectors present at Trinity's St. Louis workplace on behalf of Burgess[1] noticed that the base plate was warping. Efforts to eliminate the warping during the final welding were unsuccessful. After further discussions with the Burgess inspectors, Trinity shipped the completed north tower to a storage facility in Pennsylvania on April 16 and requested early payment, a variance from the applicable letter of credit that required inspection and approval by

[1]The Burgess inspectors satisfied a requirement that representatives of the New York sign erectors union be present during fabrication to ensure that the towers could be safely erected in New York City.

Burgess.  A Burgess field superintendent inspected the tower in Pennsylvania and reported the warped base plate.  As requested by Burgess, Trinity's Vice President and Sales Manager sent Burgess a letter stating, "The warpage will not affect the base plate to girder connection in any way."  Burgess then paid for the tower.

Burgess erected the tower when it arrived at the Manhattan job site on May 23.  The warped base plate caused gaps between the base plate and the girder of 3/4 to 1-1/16 inches.  Burgess promptly advised Trinity, "it appears that base plates have not been fabricated in accordance with . . . fabrication tolerances," and advised the project's engineer of record of the issue.  Though Trinity and Burgess proposed procedures to flatten the base plate, on June 5 the engineer of record, acting on behalf of the owner and the general contractor, declared that these procedures were not acceptable and concluded:  "We are loosing [sic] valuable time.  We should proceed with the replacement of the column."

Burgess removed the north tower and it was shipped back to St. Louis at Trinity's expense.  Burgess directed Trinity to fabricate a second north tower as well as the south tower called for by the contract.  For these two towers, Trinity developed a more thorough sequence of base plate welding procedures and reduced the size of the "fillet welds" from 5/8 inch to 5/16 inch, which reduced distortion-causing heat during the welding process.  The second north tower and the south tower were delivered and successfully erected.  Both Trinity and Burgess incurred significant unanticipated expenses in completing their parts of the project.

Trinity commenced this action in Missouri state court, asserting a breach of contract claim for the unpaid balance of the contract price (Count I), and a quantum meruit claim for the fair value of "extra work" requested and accepted by Burgess, primarily the second north tower (Count IV).  After removing, Burgess asserted breaches of contract by Trinity -- primarily the faulty first north tower -- both as damage counterclaims and as defenses to Trinity's claims.

-3-

The district court granted summary judgment dismissing the counterclaims on the ground that Burgess did not assert these claims in the time period specified in the contract. For the same reason, the court granted Trinity summary judgment on Count I, awarding $102,958 as the unpaid contract balance. The case then proceeded to trial on Count IV, the extra work claims. The jury returned a verdict in Trinity's favor on four of the five extra work claims, awarding $60,660 in damages. The district court awarded Trinity $114,649.73 in attorneys fees on Count I but denied prejudgment interest on both counts and an additur on Count IV. Burgess appeals the summary judgment rulings, the jury verdict, and the award of attorneys fees. Trinity cross appeals the denial of prejudgment interest and additur. We conclude: (i) summary judgment was improperly granted on Count I and the counterclaims; (ii) the jury verdict on Count IV is not tainted by the erroneous summary judgment ruling or by other errors alleged by Burgess on appeal; (iii) the district court properly denied Trinity an additur on Count IV; and (iv) the denial of prejudgment interest must be affirmed in part, reversed in part, and remanded in part. Accordingly, we vacate portions of the final judgment and the fee award and remand for further proceedings on Count I and the Burgess counterclaims consistent with the jury verdict.

## II. The Summary Judgment Ruling

A. The principal focus of the parties' claims and counterclaims in this case was the first north tower that was delivered to the Manhattan job site, erected, and then rejected by the engineer of record as unacceptably defective. The district court granted summary judgment dismissing Burgess's counterclaims and defenses solely on the ground that its notice of these claims was untimely. We review the grant of summary judgment *de novo*. See Baum v. Helget Gas Products, Inc., 440 F.3d 1019, 1022 (8th Cir. 2006) (standard of review). The parties agree that the substantive law of Missouri governs this diversity case.

-4-

A provision on the first page of the Trinity/Burgess sales contract stated: "Any claim(s) for damaged or incorrect material must be made in writing within five (5) days of receipt of material to be considered valid." The second page, entitled TERMS AND CONDITIONS OF SALE GOODS, included a different provision:

> If the goods which are being sold hereunder are defective, the Seller, at its sole option, will either repair the goods, replace the goods, or will take back the goods and refund to the Purchaser any purchase price that the Purchaser may have paid for the goods. If the Purchaser fails to notify Seller of any defects in the goods upon the arrival of the goods at Purchaser's business location, Purchaser will be deemed to have unequivocally accepted the goods.

In granting summary judgment for Trinity, the district court concluded that the five-day provision applied to Burgess's claims regarding the first north tower because the warped base plate made the tower "incorrect material," not "defective goods," and Burgess "did not make a claim with [Trinity] for the incorrect materials within five days of their receipt." We disagree.

Missouri has enacted the Uniform Commercial Code. The Code provides that, whenever it "requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement." Mo. Rev. Stat. § 400.1-204(1). The Code further provides that a buyer may reject tendered goods "within a reasonable time after their delivery or tender." § 400.2-602(1). The five-day provision "fixed" the reasonable time for rejection of damaged or incorrect goods. That provision would clearly be reasonable in many situations, for example, if the seller had obviously shipped the wrong product, such as a green car instead of a red car, or if the product was obviously damaged in shipment.

But that is not what happened in this case. The parties first noticed a potential defect -- the warped base plate -- at Trinity's St. Louis shop. The tower was

nonetheless shipped and Trinity requested early payment. When a Burgess field inspector again noted the possible defect, Trinity assured Burgess it would not affect the tower's performance "in any way." The tower arrived at the job site on May 23. Burgess elected to accept it. See Mo. Rev. Stat. §§ 400.2-601, 2-606(1)(a). When the tower was erected, serious gaps caused by the warped base plate appeared. Burgess notified Trinity of the apparent contract nonconformity in writing four days later, and the parties attempted to cure the problem. The engineer of record concluded that these efforts were unsuccessful and rejected the tower on behalf of the general contractor and the owner on June 5.

The UCC has remedial provisions that expressly govern this situation. Mo. Rev. Stat. § 400.2-607 provides in relevant part:

> (2) Acceptance of goods by the buyer precludes rejection . . . and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this article for nonconformity.

> (3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .

Likewise, Mo. Rev. Stat.§ 400.2-608(1) provides:

> The buyer may revoke his acceptance of a . . . commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced . . . by the seller's assurances.

These statutes demonstrate that the defective goods provision of the written contract governs this situation. Moreover, the reference to "irrevocable" acceptance in that provision may not reasonably be construed to eliminate the buyer's rights under the UCC to revoke an acceptance or to preserve other remedies in the case of a nonconformity that was unknown or could not be cured, or when acceptance was reasonably induced by the seller's assurances. Here, with timely notice of an apparent nonconformity, Trinity gave assurances that induced Burgess to accept the tower. See No. States Power Co. v. ITT Meyer Indus., 777 F.2d 405, 408-09 & n.3 (8th Cir. 1985); R.W. Murray Co. v. Shatterproof Glass Corp., 758 F.2d 266, 273 (8th Cir. 1985); Mo. Rev. Stat. § 400.2-607 (UCC cmt. 4). The nonconformity could not be cured to the engineer's satisfaction, and he rejected the tower. This substantially impaired, indeed destroyed the value of the tower to subcontractor Burgess. All this happened within a reasonable period, from erection of the tower on May 23 to its rejection on June 5. Thus, neither Burgess's counterclaims nor its defenses to Trinity's claim for the unpaid balance of the contract price are barred by the five-day notice provision. See Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1217 (3rd Cir. 1970). Of course, this does not mean that Trinity breached the contract or a warranty, only that Burgess's claims and defenses are not precluded as untimely.

B. Trinity argues that the district court's summary judgment rulings may be upheld on an alternative ground -- that all of Burgess's counterclaims and defenses are barred by another clause in the defective goods provision that limited Trinity's contractual liability:

> Purchaser shall not be entitled to recovery from the Seller for any consequential damages, incidental damages, property damage, or damages for loss of use, loss of time, shut down time, loss of profits, inconvenience, or loss of income.

Disclaimers of consequential and incidental damages in commercial contracts are generally enforceable under Missouri law. See General Elec. Capital Corp. v. Rauch, 970 S.W.2d 348, 358 (Mo. App. 1998). But it is not always easy to determine whether a claim is for direct or consequential damages. See Shatterproof, 758 F.2d at 273. Here, for example, Burgess claims damages for on-site repairs to correct nonconformities in the second north tower and the south tower, repairs that Trinity allegedly approved because it lacked union relationships needed to do the work itself. Moreover, the Missouri UCC bars damage disclaimers where "circumstances cause an exclusive or limited remedy to fail of its essential purpose," or where the exclusion of consequential damages "is unconscionable." Mo. Rev. Stat. § 400.2-719(2), (3). These are fact intensive inquiries that should be decided on a full evidentiary record. See Bracey v. Monsanto Co., 823 S.W.2d 946, 949 (Mo. banc 1992); Zimmerman v. Gen. Mills, Inc., 327 F. Supp. 1198, 1202 (E.D. Mo. 1971). Thus, these issues must be initially addressed and resolved by the district court on remand.

For these reasons, we reverse the grant of summary judgment dismissing Burgess's counterclaims and awarding Trinity damages on its claim for the unpaid balance of the contract price. We vacate the district court's grant of attorneys' fees, which was based entirely on a contract provision allowing Trinity to recover its costs of collection. The district court may of course revisit the attorneys fee question when Trinity's breach of contract claim is finally resolved.

### III. The Jury Verdict

The jury returned a verdict in favor of Trinity on four of its five Count IV quantum meruit claims for the value of extra work. Burgess argues that the district court's improper grant of summary judgment, plus jury instruction and evidentiary errors, require a new trial of these claims. To resolve these issues, we must focus more closely on the nature of those four claims and their submission to the jury. Two of the claims relate to the ill-fated first north tower; the jury awarded damages of

$49,360 on those claims. The other two are for extra work performed later in the project; the jury awarded $11,300 on those claims.

To recover on a quantum meruit claim under Missouri law, "plaintiff must plead and prove that it provided to defendant materials or services at the request or with the acquiescence of defendant, that those materials or services had a certain reasonable value, and that defendant despite demands of plaintiff, has failed and refused to pay the reasonable value of those materials and labor." Berra v. Papin Builders, Inc., 706 S.W.2d 70, 73 (Mo. App. 1986). In addition, a quantum meruit claim for "extra work" performed when plaintiff and defendant were parties to a construction contract requires proof that the work was "[1] not contemplated by the parties and [2] not controlled by the contract." Uhle v. Tarlton Corp., 938 S.W.2d 594, 597 (Mo. App. 1997); see Air Cooling & Energy, Inc. v. Midwestern Constr. Co. of Mo., 602 S.W.2d 926, 930 (Mo. App. 1980). Whether services qualify as "extra work" is an issue for the jury. See Kaiser v. Lyon Metal Prods., Inc., 461 S.W.2d 893, 899 (Mo. App. 1970).

In this case, the district court separately instructed the jury on the four quantum meruit claims. For each claim, the court instructed:

> Your verdict must be for defendant Burgess if you believe that such goods or services provided by Plaintiff Trinity was not "Extra Work". "Extra Work" is work of a nature not contemplated by the parties and not controlled by the original contract and written change orders between Plaintiff Trinity and Defendant Burgess.

Thus, the jury was specifically instructed on the additional proof required for a quantum meruit claim for extra work. Burgess complains that this instruction improperly shifted the burden of proof to the defendant on an element of the quantum meruit plaintiff's case. "A district court exercising its diversity jurisdiction need not 'give the precise instruction set out' in the Missouri Approved Instructions. . . . [T]he

-9-

district court 'has broad discretion to instruct the jury in the form and language it considers a fair and adequate presentation of substantive law.'" H.H. Robertson Co. v. V.S. DiCarlo Gen'l Contractors, Inc., 950 F.2d 572, 576 (8th Cir. 1991) (citations omitted). Although this instruction was derived from an affirmative defenses chapter of the Missouri Approved Jury Instructions manual, we do not believe the jury was likely to construe it as shifting the burden of proof. We conclude that the district court did not abuse its broad discretion in formulating this "Extra Work" instruction, nor in declining to give a change-order instruction proposed by Burgess that was inconsistent with the parties' course of dealing as established at trial.

The district court faced an additional issue in instructing the jury on the two quantum meruit claims for expenses incurred in replacing the first north tower. Trinity contracted to furnish Burgess two towers for a set contract price. After the first north tower was rejected by the engineer of record, Trinity furnished a third tower (the second north tower) at the request or insistence of Burgess and incurred shipping expenses in returning the first north tower to St. Louis. That appears to be extra work not anticipated by the parties or controlled by the contract *unless* Trinity materially breached the contract in fabricating the first north tower, in which case replacing that tower was the performance of Trinity's repair-or-replace remedial obligation under the contract. If that issue was not submitted to the jury because of the court's prior summary judgment rulings, then we must order a new trial on these quantum meruit claims. However, on each of these claims, the jury was instructed:

> Your verdict must be for Defendant Burgess if you believe:
> *First*, that the original north tower did not comply with the requirements of the contract; and
> *Second*, as a result, a second north tower was required under the contract.

Therefore, Burgess's core defense -- that it was Trinity's breach of contract that caused the replacement of the first north tower -- was submitted to and decided by the

jury *in Trinity's favor*. Burgess again complains that this instruction improperly shifted the burden of proof from Trinity to Burgess. When applied to this instruction, the contention is without merit. "The burden is on the buyer to establish any breach with respect to the goods accepted." Mo. Rev. Stat. § 400.2-607(4).

Burgess further argues that the district court "committed reversible error" in permitting a late-disclosed Trinity witness to testify at trial, and in excluding letters from Trinity to Burgess that did not assert extra work claims as irrelevant and as "related to attempts to settle and settlement discussions." After careful review of the record, we conclude that the district court did not abuse its substantial discretion in admitting and excluding evidence, nor did these rulings affect Burgess's substantial rights. See Archer Daniels Midland Co. v. Aon Risk Serv., Inc. of Minn., 356 F.3d 850, 857 (8th Cir. 2004) (standard of review).

Finally, Burgess argues that the district court erred in denying its motion for judgment as a matter of law because the alleged "extra work" in replacing the first north tower "was caused by Trinity's own failure to properly fabricate the column." As we have explained, the jury was instructed on this issue and resolved it in Trinity's favor. In our view, the evidence was sufficient to support that verdict. The breach of contract issue turned on whether the warped base plate was caused by Trinity's faulty welding, or by the engineer of record unreasonably specifying a 5/8" fillet weld.[2] If the engineer was at fault, then Trinity fabricated the first tower in accordance with the contract requirements and was not in breach. Another issue was whether the engineer

---

[2]The engineer of record's drawings called for full penetration welds with reinforcement and specified that all welds comply with AWS (American Welding Society) specifications. The applicable AWS standard allowed for reinforcing fillet welds that "need not exceed" 3/8 of an inch. Trinity then prepared shop drawings that the engineer of record approved. The size of the fillet welds was not specified in either the engineer's drawings or the shop drawings. While fabricating the first tower, Trinity contacted the engineer of record, who specified a 5/8 inch fillet weld. Trinity then complied with that instruction.

-11-

of record was unreasonable in rejecting the first tower when Burgess and Trinity proposed less radical on-site remedies. Again, if the engineer of record was at fault, Trinity performed "extra work" in implementing his unreasonable demand. It matters not that the engineer of record represented the general contractor and the owner, not Burgess. The issues were whether the original north tower did not comply with the contract and, if so, whether replacing the first north tower was required to remedy this breach of contract. If Trinity prevailed on either issue, it was entitled to a quantum meruit recovery for furnishing the second north tower.

For these reasons, we affirm the jury verdict on the quantum meruit claims and the judgment entered on that verdict. In all proceedings on remand, the parties will be bound by the jury findings that the first north tower complied with the contract and that a second north tower was not required under the contract.

## IV. Trinity's Cross Appeal

A. Trinity cross appeals the denial of its motion for an additur of $30,240 to its judgment on the jury verdict for extra work. Trinity argues that it is entitled to this additional amount so that its quantum meruit recovery equals the full value of the second north tower it furnished. We review the denial of an additur for abuse of discretion, bearing in mind that if the amount of damages was disputed, a grant of additur violates the losing party's Seventh Amendment right to a jury trial. See Novak v. Gramm, 469 F.2d 430, 432 (8th Cir. 1972). Here, the amount of Trinity's damages for furnishing the second north tower was disputed. A Trinity witness testified that the value of the second north tower was $75,600. But Burgess presented evidence that Trinity was able to reuse a great deal of the first north tower in constructing the south tower. The jury obviously found that Trinity's actual damages were less than the market value of a completely new tower. Thus, the district court did not abuse its discretion in denying the motion for additur.

-12-

B.  Trinity cross appeals the district court's denial of prejudgment interest on its claims for the contract price and for extra work.  In a diversity case, the question of prejudgment interest is controlled by state law.  Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 623-24 (8th Cir. 2003).  A Missouri statute provides that creditors shall be allowed interest at the rate of nine percent per annum, "when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made."  Mo. Rev. Stat. § 408.020.  When the damages for a claim of breach of contract are fixed or readily ascertainable and a sufficient demand is made, the statute compels the award of prejudgment interest.  See Watters v. Travel Guard Int'l, 136 S.W.3d 100, 112 (Mo.App. 2004).  However, the statute does not apply if the parties have explicitly agreed upon another rate of interest, or no interest.  See Manfield v. Auditorium Bar & Grill, Inc., 965 S.W.2d 262, 269-70 (Mo. App. 1998).

In this case, Trinity's pre-printed contract form provided for 1.5% interest per month on amounts past due, but that provision was crossed out and replaced with a handwritten notation:  "as per L/C (Letter of Credit)."  The district court concluded that this substitution reflected an intent that no interest would be owed on amounts past due, including amounts due for extra work.  Therefore, the court ruled, § 408.020 did not apply, and no prejudgment interest was owing.  A letter of credit ensures that the buyer's bank will promptly pay contract demands that conform to the letter of credit's requirements. See Waidmann v. Mercantile Trust Co. Nat. Assn., 711 S.W.2d 907, 911 (Mo. App. 1986).  Thus, we agree with the district court that replacing a contractual rate of interest for amounts past due with a provision that payment will be made under a letter of credit reflects an agreement that no interest will be owing on amounts past due, since any amounts not promptly paid would not have been demanded in accordance with the letter of credit.

Trinity does not challenge this conclusion, but it does argue that the letter of credit was for the initial contract price, $480,000, not the contract price as increased

-13-

by subsequent change orders to which Burgess agreed. Therefore, prejudgment interest should be awarded on claims for the contract price above $480,000, which would include the $102,958 awarded Trinity on Count I. This argument has some force, but the issue is controlled by the contract documents, most particularly, the terms of the letter of credit that Trinity failed to put into evidence. Therefore, on this record, we would affirm the denial of prejudgment interest on Count I. But we have reversed the grant of summary judgment on Count I and are remanding for further proceedings on that claim, so we will leave to the district court's discretion whether to revisit this aspect of its order denying prejudgment interest.

Trinity also argues that it should be awarded prejudgment interest on the jury's quantum meruit award for extra work. A plaintiff may recover interest on a quantum meruit claim under § 408.020. See Gen'l Aggregate Corp. v. LaBrayere, 666 S.W.2d 901, 909-910 (Mo. App. 1984). Because the jury specifically found that Trinity's claims for extra work were not controlled by the contract, we do not agree with the district court that the notation in the contract, "as per L/C," reflected an unambiguous intent that no interest would be paid for past due extra work claims. The case cited by the district court, Classic Kitchens & Interiors v. Johnson, 110 S.W.3d 412 (Mo. App. 2003), is not to the contrary.

However, Missouri law denies prejudgment interest when a claim is unliquidated because "where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." United States ex rel. Conner Universal Co. v. Dimarco Corp., 985 F.2d 954, 959 (8th Cir. 1993) (quotation omitted). A claim is liquidated for this purpose if it is fixed or readily determinable, that is, "ascertainable by computation." Jerry Bennett Masonry v. Crossland Const. Co., 171 S.W.3d 81, 90 (Mo. App. 2005) (quotation omitted). A quantum meruit claim for commercial services is liquidated if the reasonable value of those services can be objectively determined, because the defendant was under a duty to liquidate and pay that amount. See Lucent Tech., Inc. v Mid-West Elec., Inc., 49 S.W.3d 236,

-14-

247 (Mo. App. 2001). Here, Trinity's Count IV claims for additional stub outs ($3,300), for providing additional transportation services ($8,000), and for shipping the first north tower from the project site ($4,000), were readily ascertainable. Accordingly, we reverse the denial of prejudgment interest on those claims. However, for the same reason that Trinity's motion for additur was denied, its quantum meruit claim for furnishing the second north tower was unliquidated. Therefore, the district court properly denied prejudgment interest on the jury verdict on that claim ($43,360).

## V. Conclusion

For the foregoing reasons, the Amended Judgment of the district court dated May 9, 2006, is affirmed in part (the first and fifth operative paragraphs), reversed in part (the second and third operative paragraphs), and vacated in part (the fourth operative paragraph). The case is remanded for entry of an amended judgment awarding such amounts of prejudgment interest on jury verdicts A, B, and E as the district court concludes are appropriate, and for other further proceedings not inconsistent with this opinion. Trinity's motion to strike portions of Burgess's reply brief is denied because it is frivolous.

_____